IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DARIN JAY MILBURN, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV 02-0242-S-MHW |
| | ) | |
| v. | ) | **MEMORANDUM DECISION** |
| | ) | **and ORDER** |
| STATE OF IDAHO, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

Before the Court in this habeas corpus matter is Respondents' Motion for Summary Judgment. (Docket No. 54.) Petitioner has filed a Response to the Motion, and the parties have consented to the jurisdiction of a United States Magistrate Judge. The Court has reviewed the briefing and the record herein and has determined that this matter will be decided without oral argument. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order granting Respondents' Motion.

**Memorandum Decision & Order - 1**

I.

**BACKGROUND**

Between 10:00 p.m. and 10:30 p.m. on the night of March 31, 1992, Carey Shaddy, who had been drinking earlier in the evening, entered the Chaparral Bar in Middleton, Idaho. According to the bartender, Shaddy was "feeling good" but not intoxicated when he arrived, and the bartender loaned him money to buy a pitcher of beer. *State's Lodging B-2*, p. 238, 265. Soon, though, the bartender was required to cut Shaddy off because he had violated the bar's prohibition against drinking directly from a pitcher, instead of a glass. *State's Lodging B-2*, pp. 239-40. Shaddy also exchanged a few heated words with one of the bar's regulars. *State's Lodging B-2*, p. 266-67. Petitioner Darin Milburn, also a Chaparral regular, announced that he would give Shaddy a ride home. *State's Lodging B-2*, p. 256. At about 11:30 p.m., the bartender watched Shaddy and Milburn walk amicably across the street together and get into Milburn's car. The bartender then looked away and did not see if they departed together. *State's Lodging B-2*, pp. 257-58.

A farmer discovered Shaddy's decomposing and partially charred body in an irrigation ditch on April 11. *State's Lodging B-2*, pp. 317-18. The farmer had burned the weeds in the ditch nine days earlier, on April 2. *State's Lodging B-2*, pp. 309-10, 396. Law enforcement officials who responded to the scene did not see any wounds on Shaddy, and they initially classified his death as unexplained, but during the subsequent autopsy it became clear that Shaddy had been shot in the leg, back, and head. *State's*

**Memorandum Decision & Order - 2**

*Lodging B-3*, p. 647.  The medical examiner removed a lead slug and a partial bullet from Shaddy's body.  Police officers also discovered another bullet buried four inches into the sand in the irrigation ditch under the spot where Shaddy's head had been.  *State's Exhibit B-3*, p.554.

  The police conducted an extensive investigation, which eventually focused on Milburn.  Canyon County Sheriff's Detective Dennis Black interviewed Milburn, who denied that he gave Shaddy a ride in this car after they departed the Chaparral Bar on March 31.  Milburn claimed that Shaddy wanted to go to Caldwell, a town several miles away, and that Milburn was afraid to drive that far because he was intoxicated.  Milburn told Detective Black that he gave Shaddy a can of beer and that he last saw Shaddy walking away from his car in the direction of the bar or the highway.  *State's Lodging B-2*, pp. 415-16.

  After the interview, Milburn willingly retrieved his .44 caliber handgun from his girlfriend's home and gave it to Detective Black.  *State's Lodging B-2*, pp. 440-41.  A State's expert later determined that this handgun was the weapon that fired the bullets that killed Shaddy.  *State's Lodging B-3*, p. 630.  The police also received a statement from an acquaintance of Milburn, Christopher Pickering, who claimed that Milburn had told him that he killed someone in Middleton.  *State's Lodging B-2*, p. 285.  The State thereafter charged Milburn with first degree murder.

  A jury trial commenced in January 1993.  The State's case rested upon three primary components: (1) evidence that Milburn was the last person to be seen with

**Memorandum Decision & Order - 3**

Shaddy prior to the alleged date of Shaddy's death; (2) ballistics tests that identified Milburn's handgun as the murder weapon; and (3) Christopher Pickering's statement that Milburn told him he had killed someone. *State's Lodging I-4*, p.2. In an attempt to tighten the date of Shaddy's death to support the first component of its case, the State presented the testimony of an entomologist from Washington State University. The entomologist testified that he had examined fly larvae taken from Shaddy's body and that, based upon his knowledge of the life cycle of that particular larvae, Shaddy died on or before April 2, 1992. *State's Lodging B-3*, p. 690. This testimony was consistent with the evidence that the irrigation ditch had been burned on April 2. Milburn's trial counsel did not seriously dispute the date of death, and it was not a contested issue at trial. Instead, the defense focused its efforts on discrediting the handling of the crime scene and Detective Black's subsequent investigation, and arguing that Pickering was not truthful. *State's Lodging B-3*, pp. 728-39. Defense counsel did not call any witnesses and Milburn did not testify.

     Milburn was convicted of the lesser included offense of second degree murder, and he was sentenced to life in prison, with the first twelve years fixed. *State's Lodging A-1*, pp. 214-15. After the trial, Milburn retained new counsel and began a series of collateral proceedings in state court, alleging, in pertinent part, that his trial counsel, Klaus Wiebe and Scott Fouser, were constitutionally ineffective in failing to present certain evidence in his defense. The claims that he pursued in state court that are still relevant in this proceeding include the following: (1) counsel failed to present evidence of an alternative

**Memorandum Decision & Order - 4**

suspect, Wes Huskey, who went into a Middleton bar on April 8th or 9th, 1992, exclaiming that he had "killed the wrong person," and who allegedly also called a substance abuse facility claiming that he had killed the wrong person; (2) counsel failed to impeach Christopher Pickering with several inconsistent statements; and (3) counsel failed to present the testimony of witnesses who claimed to have seen Shaddy alive after April 2. After the Idaho Court of Appeals ordered further factual development on these claims, *see Milburn v. State*, 946 P.2d 71 (Idaho Ct. App. 1997) (*Milburn I*), the state district court conducted a full evidentiary hearing, ultimately denying the claims. *State's Lodging G-1*, pp. 89-101. The Idaho Court of Appeals thereafter affirmed the district court. *State's Lodging I-4; Milburn v. State*, 23 P.3d 775 (Idaho Ct. App. 2000) (*Milburn II*) .

On May 29, 2002, Milburn filed the present federal Petition for Writ of Habeas Corpus, raising five claims of constitutional error, which he later supplemented with additional claims. (Docket No. 1; Docket No. 18.) After this Court dismissed several claims as procedurally defaulted (Docket No. 31), Milburn has been permitted to proceed with the three claims of ineffective assistance of counsel mentioned above, in addition to a claim regarding the cumulative effect of counsel's errors and a claim that the State's late disclosure of witnesses during the post-conviction proceeding violated his right to due process. Respondents have filed an Answer to the Petition and a Motion for Summary Judgment on the merits of the remaining claims. Milburn has filed a response, and the matter is now ripe for decision.

**Memorandum Decision & Order - 5**

## II.

## STANDARD OF LAW

    A.    <u>The Antiterrorism and Effective Death Penalty Act</u>

Under the Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The Federal Rules of Civil Procedure apply to habeas corpus actions except where application of the rules would be inconsistent with established habeas practice and procedure. *See* Rule 11 of the Rules Governing Section 2254 Cases. In general, the standards governing summary judgment motions are not inconsistent with established habeas practice and procedure. *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977). In a habeas proceeding, however, a state court's determination of the facts will be presumed correct unless the petitioner rebuts those factual findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Petition in this case is subject to the provisions of the Anti-terrorism and Effective Death Penalty Act (AEDPA), which was enacted in 1996. The AEDPA established a deferential standard of review that a federal habeas court must apply to a state court's resolution of constitutional claims. Under AEDPA, a federal court may grant habeas relief only if the state court's adjudication on the merits:

    1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" federal law when the state court applied a rule of law different from the governing law set forth in United States Supreme Court precedent, or when it confronted a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrived at a different result. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application" of federal law when the court was "unreasonable in applying the governing legal principle to the facts of the case." *Id*. at 413. A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision was incorrect; instead, the decision must be "objectively unreasonable." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Though the source of clearly established federal law must come from the holdings of the United States Supreme Court, circuit law may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

    B.    <u>Clearly Established Federal Law</u>

A criminal defendant has a constitutional right to the assistance of counsel under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set out the proper test to be applied to claims

**Memorandum Decision & Order - 7**

alleging constitutionally inadequate representation.  To succeed on such a claim, a petitioner must show both that counsel's performance fell below an objective standard of reasonableness and that the petitioner was prejudiced thereby.  *Id*. at 684.  Prejudice under these circumstances means that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *Id*. at 684, 694.  A reasonable probability is one sufficient to undermine confidence in the outcome.  *Id*. at 694.

In assessing whether trial counsel's representation fell below an objective standard of competence under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, and every effort must be made to eliminate the distorting lens of hindsight.  *Id*. at 689.  The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  *Id*.  If counsel has conducted a reasonable investigation, or decided that an particular investigation was unnecessary based upon the exercise of reasonable professional judgment, then counsel's subsequent tactical decisions will be "virtually unchallengeable."  *Id*. at 689-91.  The pertinent inquiry "is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."  *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

**Memorandum Decision & Order - 8**

## III.

## DISCUSSION

As an initial matter, the Court concludes that Milburn's fifth claim, in which he alleges that the State's late disclosure of witnesses during post-conviction proceedings violated his due process rights, is not cognizable in this proceeding. *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989) (post-conviction errors not reviewable in a habeas proceeding). That claim will be dismissed.

Milburn's surviving claims of ineffective assistance of counsel are that counsel failed to introduce evidence of an alternative suspect, failed to impeach Christopher Pickering sufficiently, and failed to present witnesses who claimed to have seen Shaddy alive after the State's alleged date of death. The state district court conducted a full evidentiary hearing on these claims, which covered several days and involved many witnesses. Attorneys Wiebe and Fouser testified extensively at the hearing, asserting that although they were aware of the evidence that Milburn claims should have been introduced, they decided, for tactical reasons, not to introduce it. The state district court concluded that counsel's decisions were not unreasonable, and the Idaho Court of Appeals, after identifying *Strickland* as providing the correct legal standard, affirmed this conclusion. *Milburn v. State*, 23 P.3d 775 (Idaho Ct. App. 2000).

Because the Idaho Court of Appeals correctly identified *Strickland*, and because it did not confront a set of indistinguishable facts and yet arrive at a different result from that precedent, its decision is not "contrary to" clearly established federal law. *See*

**Memorandum Decision & Order - 9**

*Williams*, 529 U.S. at 412-13.  For the reasons that follows, the Court also finds that its adjudication of Milburn's claims is not an "unreasonable application" of that law.[1]

  (1) <u>Milburn's First Claim--The Wes Huskey Evidence</u>

In this claim, Milburn contends that his trial counsel were constitutionally ineffective when they failed to present to the jury evidence of an alternative suspect, Wes Huskey.  Huskey, allegedly quite upset and with fresh blood on his face, went into a Middleton bar a few days before Shaddy's body was discovered and informed several people that he had killed someone but that it was "the wrong person."  Huskey told at least one witness that he had to go burn the body.  *State's Lodging H-2*, pp. 37-38.  A man who identified himself as Huskey also called a substance abuse facility on two occasions and said that he had killed "the wrong man."  *See Milburn II*, 23 P.3d at 781.  When interviewed by the police, however, Huskey denied killing anyone, although he claimed that someone had offered to pay him $5,000 to kill a man, D.E.  *Id.*

At the conclusion of the post-trial evidentiary hearing, the state district court found that because Huskey told the police that he did not kill anyone and could not remember making statements to the contrary, Milburn had failed to show how Huskey's out of court statements, which were hearsay, would have been admissible at trial.  *State's Lodging G-1*, pp. 10-11.  On appeal, the Idaho Court of Appeals likewise concluded that Huskey's

---

[1] Milburn does not appear to argue that the Idaho Court of Appeals' decision was based upon an unreasonable interpretation of the facts in light of the evidence presented during state court proceedings.  He is not entitled to relief under 28 U.S.C. § 2254(d)(2).

**Memorandum Decision & Order - 10**

statements were hearsay and inadmissible. *Milburn II*, 23 P.3d at 782. In reaching that conclusion, the Idaho Court of Appeals rejected Milburn's argument that Huskey's statements were admissible, under Idaho Rule of Evidence 804(b)(3), as statements against his interest. *Id*. Because these statements could not have been introduced at trial in the first instance, the state appellate court concluded that Milburn had not proven that his trial counsel were ineffective. *Id*. at 783.

This Court must defer to the Idaho Court of Appeals' interpretation of Idaho's evidentiary rules. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Because the state court determined that the evidence would not have been admissible under its own law, this Court agrees that trial counsel cannot be deemed to have acted unreasonably, for purposes of the Sixth Amendment, in failing to offer inadmissible evidence at trial. *See Parker v. Scott*, 394 F.3d 1302, 1326 (10th Cir. 2005) (finding counsel not ineffective in failing to introduce evidence that the trial court had ruled inadmissible); *cf. Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001) (failure to object to admissible evidence is not ineffective assistance); *see also United States v. Bosch,* 914 F.2d 1239, 1247 (9th Cir. 1990) (same).

Alternatively, even if aspects of the Huskey evidence would have been admissible, Milburn's trial attorneys offered legitimate tactical reasons to reject the evidence. The defense team's investigator testified that he considered Huskey not to be a credible person, and attorney Fouser testified that Huskey was a "fairly notorious drunk." *State's Lodging H-2*, pp. 201-02, 375. These rather low opinions were apparently shared by the

**Memorandum Decision & Order - 11**

bartender to whom Huskey made some of his statements; she testified that she took anything that Huskey had to say "with a grain of salt" because he would often come into the bar with stories of "cutting somebody open or fighting somebody or shooting somebody. You know, every time he came in, he had a different story to tell." *State's Lodging H-2*, p. 46. Huskey himself admitted to the police that when he is drunk he is "the biggest liar in the world anyway." *Milburn II*, 23 P.3d at 782 n.4.

In addition to the general problems with the Huskey's credibility, Milburn's trial attorneys testified that the State's evidence regarding the date of Shaddy's death was quite strong, to the point of being "written in stone," and for Huskey to be a viable alternative suspect, the jury would be required to ignore this solid evidence and find that Shaddy died several days later. *State's Lodging H-2*, pp. 292, 376. Attorney Wiebe added that the defense had no explanation for the jury regarding how Huskey might have used Milburn's gun, which the State's ballistics evidence conclusively identified as the murder weapon. *State's Lodging H-2*, pp. 303-04. In light of these intractable evidentiary problems, counsel did not believe that the jury would give any credence to a defense theory that Huskey might have killed Shaddy, with Milburn's gun, on April 7th, 8th, or 9th.

Accordingly, after investigating the Huskey matter, trial counsel concluded that presenting a defense based upon Huskey as a possible suspect would have detracted from their credibility and rapport with the jury. This is precisely the type of informed strategic decision that this Court cannot second-guess years after the fact and based on a cold

**Memorandum Decision & Order - 12**

record.  *See Strickland*, 466 U.S. at 690-91.  The Court concludes that counsel's decision to exclude this evidence did not fall below an objective standard of reasonable representation.

  (2) <u>Milburn's Second Claim--Failure to Impeach Christopher Pickering</u>

In his second habeas claim, Milburn contends that trial counsel failed to use inconsistent statements to impeach Christopher Pickering, who testified at trial that Milburn told him that he killed someone in Middleton.

Pickering had made several additional statements before trial that were not introduced into evidence.  During a police interview, Pickering said that his wife, Dawn Hogan, could tell them more about the murder because she and Milburn and talked about it.  Hogan, however, denied that she had such a conversation with Milburn, claiming that the first time she heard about the murder was when Pickering told her.  She further denied that she was married to Pickering or that she had a child with him, as he had claimed.  *State's Lodging D-1*, pp. 136-37.  In yet other pretrial statements, Pickering greatly expanded the circumstances of the murder.  He told Anora Baxter and Vicky Boyd that the murder had occurred while Shaddy, Milburn, and a third individual were gopher hunting, that the first shot was accidental but the last two were intentional, that the gun the police had was not the murder weapon, and that the true murder weapon had been in Pickering's car.  *State's Lodging H-2*, pp. 190-92.

At trial, Milburn's defense counsel did not use Pickering's full statements to Hogan, Baxter, or Boyd to impeach him.  Instead, Wiebe confronted Pickering with his

**Memorandum Decision & Order - 13**

testimony from the preliminary hearing, when Pickering failed to implicate Milburn. Wiebe testified at the post-trial evidentiary hearing that he believed that he had thoroughly discredited Pickering, even with this limited questioning, and that the jury did not find Pickering to be believable. *State's Lodging H-2*, pp. 297-98. The Idaho Court of Appeals determined that counsel arrived at their decision on how to handle the impeachment of Pickering after exercising sound professional judgment. *Milburn II*, 23 P.3d at 783-85. This Court agrees.

Specifically, in regard to the Hogan statements, Wiebe testified at the post-trial evidentiary hearing that if he opened the door to this evidence, Hogan might also claim that Pickering seemed genuinely upset when he learned that Shaddy had actually been killed. Wiebe believed that testimony regarding Pickering's demeanor could have enhanced the credibility of his claim that Milburn had confessed to him. *State's Lodging H-2*, pp. 297-300. This explanation is clearly reasonable.

Trial counsel reached a similar decision regarding the Baxter and Boyd statements. Counsel believed that the introduction of Pickering's elaborate, "gopher hunting" statements, though somewhat inconsistent with his stripped down trial testimony, could have easily backfired because Pickering still implicated Milburn in the murder in those statements. Perhaps even more damning to Milburn's cause was Pickering's claim that the final two shots were intentional, which, if believed, could have supported a finding of premeditation and a guilty verdict on first degree murder.

**Memorandum Decision & Order - 14**

Furthermore, trial counsel testified that they sought to prevent the State from introducing Pickering's prior *consistent* statements. *State's Lodging H-2*, pp. 371-72. They researched the legal issue regarding the admissibility of prior consistent statements and concluded that limiting the cross-examination to Pickering's failure to implicate Milburn at the preliminary hearing afforded them the best opportunity to exclude those statements while still defusing some of the impact of his testimony. This strategy worked; the State was not permitted to introduce Pickering's consistent pretrial statements in rebuttal.

For all of these reasons, this Court concludes that the Idaho Court of Appeals' determination that Wiebe and Fouser exercised sound professional judgment was not an unreasonable application of clearly established federal law. Milburn's second claim will be denied.

(3)   Milburn's Third Claim--"Post-Mortem" Sightings of Shaddy

In his third claim, Milburn alleges that his trial counsel were ineffective for failing to present four witnesses who claimed to have seen Shaddy alive after the date that the State alleged that his body was in the irrigation ditch, which was no later than April 2, 1992.

Steve Garwick, who was a former classmate of Shaddy's and knew him well, testified at the post-trial evidentiary hearing that he believed that he saw Shaddy on April 7, 1992, at the Gem Stop, a gas station in Middleton. *State's Lodging B-5*, p. 824. The defense's investigator attempted to confirm that Garwick saw Shaddy in April, but when

**Memorandum Decision & Order - 15**

he checked the records at the Gem Stop, the only purchase by Garwick he could confirm was on March 27.  *State's Lodging H-2*, pp. 168-70.  Because of the April sighting could not be corroborated, the defense determined that Garwick's testimony would not be of much assistance.

Bonnie Penny worked at the Gem Stop and claimed that she believed she saw Shaddy there one time between April 5 and April 7.  *State's Lodging B-5*, pp. 845-46.  The defense team's investigator knew Bonnie Penny independently of this case, and based upon his knowledge of Penny's tendency to put herself in the middle of any case, he did not believe her sighting was credible, a sentiment he would have conveyed to the attorneys.  *State's Lodging H-2*, pp. 163-64.

The two strongest witnesses were Ed Lundquist and Heather Mattson, who claimed to have seen Shaddy at a car wash on April 3 while they were on their way to a concert in Boise.  Mattson was well-acquainted with Shaddy and had even dated him for a brief time.  *State's Lodging H-2*, pp. 154-55.  And unlike Garwick and Penny's sightings, the April 3rd could be verified.

Although the attorneys were aware of all of these witnesses, they chose, as a matter of trial tactics, not to use any of them.  Defense counsel testified that the State's evidence supporting the date of death--which included the entomologist's testimony, documentary evidence and witness testimony establishing April 2 as the date on which the ditch was burned, and photographic evidence showing the body in the ditch and the burn patterns on the body--was simply overwhelming.  Counsel believed that presenting

**Memorandum Decision & Order - 16**

evidence that conflicted with the date would have detracted from their credibility with the jury and undermined their theory of defense.  The Idaho Court of Appeals accepted this justification as reasonable.  *Milburn II*, 23 P.3d at 784-86.  The Idaho Court of Appeals also determined that Garwick and Penny's statements had limited probative value because the precise dates that they allegedly saw Shaddy could not be independently verified, and the court further determined that the State would have exploited Mattson and Lundquist's brief opportunity to observe the person they believed to be Shaddy as they passed the person in their vehicle.[2]  *Id*.

The state court's decision rejecting Milburn's claim did not involve an unreasonable application of *Strickland*.  In particular, this Court agrees that the State's evidence of the date of Shaddy's death was unusually strong in this case.  Shaddy's body was found partially burned in an irrigation ditch that had been conclusively shown to have been burned on April 2.  The State's entomologist established the date of death as being on or before April 2.  In preparation for trial, defense attorney Scott Fouser read a book that the State's expert had written about entomology and death, and the defense contacted an independent forensic entomologist, who concurred with the State's expert.

---

[2] The Court of Appeals also rejected Milburn's claim that yet another witness had relevant information.  *Milburn II*, 23 P.3d at 785. That witness claimed to have overheard an individual named Tim Dubose say that he gave Shaddy a ride home "that night," which the witness assumed meant March 31.  The defense investigator followed up on this lead, and Dubose admitted giving Shaddy a ride, but he claimed that it was at 6:00 p.m. in the evening and several weeks before the murder.  *State's Lodging H-2*, pp. 175-76, 369.  Milburn does not appear to press the claim here, but, in any event, the Court concludes that the state court's disposition of this claim was not unreasonable.

**Memorandum Decision & Order - 17**

As a consequence, Milburn's trial attorneys realized that they did not have any scientific evidence of their own that could dent the State's presumptive date of death. Without such evidence, the impact of lay witnesses whose testimony contradicted the date would have been minimal. *Cf. Lord v. Wood*, 184 F.3d 1083 (9th Cir. 1999) (finding ineffective assistance based upon counsel's failure to investigate "post-death" sightings when the state had not presented hard scientific evidence of the date of death). This is particularly true when, as here, each alleged sighting could be impeached. The dates on which Garwick and Penny claimed to have seen Shaddy could not be independently verified, and Mattison and Lundquist's limited opportunity to observe the person they thought was Shaddy, as they passed him in their car, would have been thoroughly explored on cross-examination. It is likely that, as Wiebe testified, the jury would have decided that these witnesses were "just dead wrong." *State's Lodging*, H-2, p. 292.

Therefore, because counsel investigated the witnesses' statements and evaluated the utility of that evidence within the context of the entire case, this Court concludes that counsel made an informed tactical decision that will not be disturbed. *See Hensley v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995) (holding that to find deficient performance, a tactical decision must have been objectively unreasonable); *see also Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (noting that to reverse a tactical decision, it must be so "patently unreasonable" that no competent attorney would have made it). The Court further concludes that even if Milburn could show that an error occurred, he would not be able to demonstrate actual prejudice. Given the strength of the State's evidence

**Memorandum Decision & Order - 18**

supporting the date of death and the ballistics evidence that tied Milburn's gun to the murder, and even if Pickering's testimony is not given much weight, there is no reasonable likelihood that the jury would have acquitted Milburn had counsel called any or all of these witnesses to the stand.

  (4) <u>Milburn's Fourth Claim--Cumulative Error</u>

  Finally, Milburn alleges that even if each of counsel's individual errors are not reversible, they accumulated to violate his right to a fair trial. Because the Court did not find any individual error in this case, the cumulative error doctrine is inapplicable. Therefore, the Court will not reach Respondents' contention that Milburn is attempting to create a new constitutional claim, in violation of the non-retroactivity principles of *Teague v. Lane*, 489 U.S. 288 (1989).

## IV.

## CONCLUSION

  Milburn has not shown that the state court's resolution of his claims was contrary to or an unreasonable application of clearly established federal law, or that the state court's decision was based upon on unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Respondents are entitled to judgment as a matter of law. The remaining claims in the Petition shall be denied.

## V.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Respondents' Motion for Summary Judgment (Docket No. 54) is GRANTED.

IT IS FURTHER ORDERED that Petitioner's Claim 5 is dismissed as not stating a claim upon which relief can be granted, and Petitioner's Claims 1(a), 2, 3, and 4 in the Petition for Writ of Habeas Corpus are DENIED.

DATED: **April 18, 2005**

_____
Honorable Mikel H. Williams
United States Magistrate Judge